Neel, Stephen E., J.
This litigation arises out of improper option and margin trading by defendant Daniel Carpenter (Carpenter) of the plaintiffs’ monies held by Benistar Property Exchange Trust Co., Inc. (Benistar) in qualified intermediary escrow accounts pursuant to 26 U.S.C. §1031(a)(3). Beginning in 1998, Benistar deposited the funds in margin accounts at Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch or Merrill) and used the funds to engage in aggressive, high-risk uncovered option trading. Ultimately, Benistar lost more than $8 million of the plaintiffs’ money.[3] These consolidated actions followed.
The case was tried in late 2002. The jury found the defendants Benistar, Carpenter and his wife Molly Carpenter liable on a variety of common-law claims, and awarded plaintiffs $8,644,150 in compensatory damages.[4] The jury also found Merrill liable for aiding and abetting Benistar’s conversion, aiding and abetting Benistar’s breach of fiduciary duty, and violating the New York and Connecticut consumer protection statutes.[5]
The trial judge allowed Merrill’s motion for judgment n.o.v., finding insufficient evidence that Merrill had actual knowledge of the Benistar defendants’ wrongdoing. Subsequently, the judge allowed the plaintiffs’ motion for a new trial against Merrill on the basis of newly discovered evidence; the Appeals Court and the Supreme Judicial Court affirmed her decision. See Cahaly v. Benistar Prop. Exch. Trust Co., Inc., 69 Mass.App.Ct. 668, 683 (2007); Cahaly, 451 Mass. at 369. Following a trial before this Court in June 2009, *2 a jury once again found for the plaintiffs on all of their claims against Merrill.
Plaintiffs’ claims for punitive and consequential damages against Merrill were tried before the Court, without jury, from June 30 through July 9, 2010; counsel presented closing arguments on September 28, 2010. Also pertinent to the damages issues is a pending motion regarding the manner in which settlement funds previously received by plaintiffs in respect of their claims against UBS PaineWebber, Inc. (Paine-Webber), successor firm to Merrill for the Benistar accounts, are to be allocated between punitive and compensatory damages. Finally, plaintiffs seek an award against Merrill for the amount of attorneys fees and costs reasonably incurred by plaintiffs in prosecuting their claims against Merrill.
FINDINGS OF FACT
After considering the evidence and inferences reasonably drawn therefrom, the Court finds the following facts with regard to punitive damages, consequential damages, allocation of the PaineWebber settlement, and attorneys fees and costs.
I. Punitive Damages A. Merrill Lynch
1. Organization and Personnel
The relevant Merrill offices included the Fifth Avenue branch in New York Ciiy (branch), and the Office of General Counsel (OGC), comprising Compliance, Anti-Money Laundering, and the Legal group.
a. The Branch
Hassan Tabbah. Tabbah was the Manager of the branch from at least October 1998 until September 2004. His responsibilities included supervising and managing the branch, particularly with regard to sales, hiring, training, and developing and driving the firm’s strategy. He was ultimately responsible for supervising about 110 brokers, who managed more than 30,000 accounts.
Tabbah was at all relevant times a managing agent for Merrill. He did not, however, make policy for Merrill with respect to circumstances under which a brokerage client could trade other people’s money; rather, in that area he was to implement established policy.
As a branch manager, Tabbah was discouraged by Merrill from reporting suspected illegal activity directly to law enforcement or regulatory authorities. Merrill’s policy was that branch managers were to report such issues to others in Compliance and Legal.
Thomas Rasmussen. Rasmussen was the administrative manager of the branch from 1998 until September 29, 2000. He reported to Sam Stidham, regional administrative manager. Rasmussen had previously worked for Merrill as an operations manager.
Rasmussen had responsibility for certain aspects of the branch’s business, principally relating to administrative and compliance issues; he also had responsibility for supervising the branch’s brokers and accounts, supervising 40-50 support staff, overseeing all office facilities, hiring and firing client associates (brokers’ assistants), reviewing several daily reports (including one detailing all trades at the branch), handling customer complaints, approving new accounts, and conducting all active account reviews.
Like Tabbah, Rasmussen was at all relevant times a managing agent for Merrill. He did not, however, make policy for Merrill with respect to circumstances under which a brokerage client could trade other people’s money; rather, in that area he was to implement established policy. As a manager, Rasmussen was discouraged by Merrill from reporting suspected illegal activity directly to law enforcement or regulatoiy authorities. Merrill’s policy was that branch managers were to report such issues to others in Compliance and Legal.
Gary Stern. Stern has been a financial consultant— broker—at the branch since 1985. He was not involved in making policy for Merrill, nor did he have discretion to deviate from policy. He was responsible for employees in his small group; he had no other supervisory responsibilities. Stern and Gerald Levine shared the Benistar account.
Gerald Levine. Levine was a financial consultant for the branch, and was the person primarily responsible for dealing with the Benistar accounts. He was not involved in making policy for Merrill, nor did he have discretion to deviate from policy. He had no supervisory responsibilities, and no one reported to him. He left Merrill in March 2003.
Levine handled the opening documentation for the Benistar accounts, including gathering the information to include on the forms. With regard to trading and servicing the accounts, he handled Dan Carpenter and Benistar largely on his own.
Janine Del Grosso. Del Grosso was a client associate (administrative assistant) at the branch. She assisted Stern and Levine, and handled paperwork concerning wire transfers for the Benistar account.
Nancy Sawyer. Sawyer was the Service Manager for the branch from December 1998 through September 10, 2000. She was responsible for administrative tasks related to operations, including deposits, processing transactions, journal entries, fed fund wires, and checks. She did not have responsibility for cashiers or the wire room, which were located on a different floor of the branch. She supervised one employee, Steven Castillo. Her annual compensation was approximately $50,000.
Sawyer had no role in reviewing account opening documents; no responsibility for identifying or detecting improper trading in customer accounts; no authority or discretion to approve, disapprove, or restrict trading in a customer’s account or to discipline brokers. She was not an NASD Registered Representative, *3 was not permitted to deal in securities, and had no Rule 405 (“knowyour customer”) responsibilities. She had no role in making policy at Merrill, and no discretion to vary existing policy. Rather than reporting suspected illegal activity to law enforcement or regulatory authorities, she was expected to report any such suspicions to her superiors.
Steven Castillo. Castillo was an entry-level “document controller,” and was paid approximately $22,000 to $24,000 per year. He had responsibility primarily for general office duties and ministerial tasks. He had no policy making authority, and no supervisory responsibility. As with the other employees mentioned, he was expected to report suspected wrongdoing to his superiors, rather than directly to the authorities.
b.Office of General Counsel (OGC)
In the fall of2000, Steve Hammerman was Merrill’s General Counsel and Vice-Chairman of the firm. He had previously headed the SEC’s New York office and had worked as an Assistant U.S. Attorney. Ex. 1543 is an organization chart for OGC’s Private Client Group within OGC. George Schieren reported to Hammer-man, Barry Mandel reported to Schieren, and Chuck Senatore, First Vice President for Private Client Compliance, reported to Mandel.
Those within OGC authorized to make a final determination as to whether and to whom to report suspected illegal activity were Hammerman, Schieren, Mandel, Senatore, Anne Flannery (First Vice President, Regulatory, reporting to Mandel), and Nicholas Piccininni (Anti-Money Laundering, also reporting to Mandel), all attorneys. Merrill policy was that all OGC employees subordinate to those individuals were to “elevate,” i.e., report, suspected illegal activity to their supervisors.
c.Compliance
The Compliance Group, part of OGC, existed to ensure that Merrill was acting in compliance with federal securities laws, self-regulatory organization rules, the firm’s own policies and procedures, and other regulations. Its responsibilities included performing surveillance of active accounts (Compliance-Surveillance), addressing issues with options (Options Compliance), investigating employee conduct (Internal Investigations), conducting branch office audits (Branch Office Compliance), and several other functions.
Within Private Client Compliance, Dennis Pape, Director of Surveillance, reported to Senatore; Steve Snyder, Surveillance, and George Janos, Options Compliance, reported to Pape; and Martin Malia, Options Compliance, reported to Janos.
Compliance-Surveillance, headed by Pape, was responsible for checking certain active account reviews done by the administrative manager on the branch level, providing a double-check of account reviews.
Steve Snyder, responsible for Surveillance, reports to himself. Because of his experience in the compliance field, he was a resource for other Merrill employees.
Options Compliance, headed by Janos, was responsible for issues relating to options suitability, including aggressive strategies and losses. The group was a specialty group, from which other groups at Merrill would seek advice about options issues.
Malia, who worked in Options Compliance and reported to Janos, had no policy making authority, and no supervisory responsibilities.
In the fall of 2000, the only employees within OGC with authority to develop and set firm policy related to Compliance were Hammerman, Schieren, Mandel, and Senatore. The only employee within Compliance with authority or discretion to make a final determination as to whether and to whom to report suspected illegal activity was Senatore.
d.Anti-Money Laundering
The Anti-Money Laundering (AML) group, part of OGC, was responsible for investigating and responding to suspicions of money laundering. In the fall of 2000, it focused on cases in which the source of funds was unknown, with particular emphasis on domestic and international organized crime and drug money laundering. Piccininni was the only AML employee with authority to make a final determination as to whether and to whom to report suspected illegal activity.
In the fall of 2000, Modesto Moya worked at AML and reported to Piccininni. Before working at AML, he had worked in Options Compliance, and was a respected compliance officer whom others at Merrill would consult about compliance and options issues.
e.Legal
The Legal group was part of OGC, and had responsibility for litigation. Scott Bieler was First Vice President for Private Client Litigation, and reported to Mandel. Robert Goldberg, head of Private Client Litigation—East, reported to Bieler, and Kevin Duffy, Private Client Litigation, reported to Goldberg
Duffy, an attorney, had no supervisory responsibilities, and no one reported to him. Neither he nor anyone else in Private Client Litigation was authorized by Merrill to report suspicious activity directly to law enforcement or regulatory authorities; rather, they were to “elevate” such suspicions to their superiors.
2. Merrill’s Policies
Merrill policy prohibited its brokers from opening or maintaining margin or speculative accounts for anyone acting in a fiduciary capacity.
Merrill policy prohibited its brokers from opening or maintaining accounts for agents acting on behalf of another without proper documentation, and prior approval by New Accounts.
*4 The account opening forms for corporate accounts at Merrill required that a customer opening a corporate account represent, by the customer’s signature, that no one other than the account holder held any interest in the funds in the customer’s account.
According to Merrill’s Guidelines of Business Conduct, employees were obligated to report suspected misconduct (including unauthorized trading) to their supervisors.
B. The Benistar Accounts
Plaintiffs all planned to do property exchanges under §1031, and chose Benistar as their qualified intermediary. All plaintiffs sold real estate and entrusted the proceeds to Benistar.
Each plaintiff entered into an agreement with Benistar under which that plaintiff agreed to pay Benistar a fee, and Benistar agreed to hold in escrow the funds plaintiff received from the sale of real estate until such time as the plaintiff directed Benistar to release the funds.
In October 1998, Benistar, through its owner, Carpenter, opened accounts at the branch. In the account opening documents, Benistar represented that no one other than the account holder held any interest in the funds in the Benistar accounts. Absent such a representation, Merrill policy would not have allowed Benistar to open a corporate account.
Merrill approved the Benistar accounts for options trading.
The Benistar accounts provided significant revenues to the branch. In 2000, for example, they generated just over $300,000 in commissions. Gross revenue for the branch in that year was about $188 million. Because about half of the branch’s 30,000 accounts were active that year, the average gross revenue per account for 2000 was about $12,500; thus, commissions from Benistar’s accounts for that year were about twenty-forir times the average. On the other hand, Benistar revenue amounted to only 0.16% of the branch’s 2000 gross revenue.
To the extent that the profitability of the branch affected Tabbah’s bonus, the effect of the Benistar revenue was minuscule. Rasmussen’s compensation was not affected by commissions or branch performance.
C. The Patterson Documents
On October 21, 1998, attorney David Patterson, at Carpenter’s suggestion, called Levine about the Benistar account at Merrill. He told Levine that his client’s escrow money was to be placed in an account in Benistar’s name for the purpose of completing a §1031 exchange.
On October 22, 1998, Levine sent Patterson a fax attaching subaccount authorization forms that had nothing to do with the handling of escrow funds. Patterson noted that the forms were not responsive to his inquiry about an escrow account for his client, and on October 23, 1998, sent Levine a letter and a fax containing “one fully executed copy of the Escrow Agreement under which the funds will be held . . . [and the] Exchange Agreement and ML Account Selection Form and Benistar’s Wiring Instructions." (Emphasis in original.) Patterson’s letter also informed Levine that “the funds will be held in a Merrill Lynch account pursuant to the Escrow Agreement with Benistar’s officer, Daniel B. Carpenter being the single signatory on the account.” 2009 Trial Ex. 19C. (Emphasis in original.)
The Escrow Agreement provided that “1. Benistar shall open an Escrow Custodial Account under Benistar’s name at Merrill Lynch for the Exchangor’s benefit; 2. Benistar shall have full control over the Exchangor’s funds to invest as the Exchangor directs in either the 3% Ready Asset Money Market Fund or the 6% Merrill Lynch Investment Account.” Id., Escrow Agreement, paras. 1-2.
The Exchange Agreement repeated the strict limitation on the manner in which the escrowed funds could be invested: “Exchangor and Intermediary expressly agree that any cash proceeds received from the disposition of the Relinquished Property shall be held and invested with Merrill Lynch Private Client Group in either 3% per annum in a Merrill Lynch Ready Asset Money Market account, or 6% per annum in a Merrill Lynch investment account.” Id., Exchange Agreement, para. 10.
The Escrow and Exchange Agreements thus made it crystal clear that the Merrill account was to be “an Escrow Custodial Account under Benistar’s name,” and that any investment other than in the “3% Ready Asset Money Market Fund or the 6% Merrill Lynch Investment Account” was not authorized.
Levine testified that he does not recall speaking with Patterson, and he denies that he ever understood that the Benistar accounts contained third-party escrow funds. The Court finds that Levine did speak with Patterson, received the documents which Patterson sent him immediately thereafter, understood that the Benistar accounts contained third-party escrow funds, understood that options trading in the Benistar accounts would violate the Escrow and Exchange Agreements which Carpenter’s client had sent him, and failed to take appropriate steps in light of that knowledge.
It was a fireable offense for a Merrill broker to allow a client to trade third-party funds without authorization.
Levine did not share his knowledge with anyone at Merrill. Consequently, no one else at Merrill was aware of Levine’s interaction or correspondence with Patterson.
Despite Merrill’s document retention policy for correspondence, the Patterson documents were dis *5 carded at some unknown time. But for Patterson’s alerting plaintiffs’ counsel of their existence in 2004, the Patterson documents likely would not have surfaced in this litigation.
D. Events Prior to September 20, 2000
Evidence of events prior to September 20, 2000 focuses on the following primary topics.
1.Levine
For nearly two years, from October 1998 until September 20, 2000, Merrill allowed Carpenter to trade naked options in the Benistar accounts. During that time, Levine had actual knowledge that Benistar was thereby breaching the contractual and fiduciary duties it owed to its clients, and with that knowledge provided substantial assistance to Benistar by facilitating Carpenter’s trades.
Despite the concerns which Merrill employees had about Carpenter’s mounting losses as the market deteriorated in 1999 and 2000, and in view of the evidence reviewed below, the Court finds that, prior to September 20, 2000, no Merrill employee other than Levine had actual knowledge of Carpenter’s malfeasance.
2.Regulatory Requirements, Wire Transfer Records, Visits to Benistar Website
Much of the evidence upon which plaintiffs rely in the present matter to argue that Merrill had actual knowledge was presented at the 2002 trial, and has been considered and disposed of by the Supreme Judicial Court in Cahaly. Specifically, the court ruled on six categories of evidence, three of which are pertinent here.
Plaintiffs’ second category of evidence was “comprised of Rule 405 of the Rules of the Association of Securities Dealers, and Merrill Lynch compliance policies that, in summary, require a broker or financial adviser to use ‘due diligence’ to ‘know the client’ when opening and managing the client’s investment accounts.” Id. at 354. The court concluded that whether Levine and Stem complied with those mies and policies or not, “[n]either alternative translates to affirmative evidence that Merrill Lynch had actual knowledge that the Benistar Tmst Account contained third-party funds, and that Carpenter’s high-risk options trading in the Benistar Tmst account was in breach of its fiduciary duties.” Id.
Plaintiffs’ third category was evidence which they “laid before the jury” of “voluminous documentary evidence of wire transfer authorizations and wire transfer confirmations for the Benistar Trust account that indicated that substantial sums flowed constantly between Benistar Tmst and various third-party bank accounts, attorney tmst accounts, and other accounts of an evidently custodial nature.” Id. at 355. While the court noted that the jury “may well have agreed with the plaintiffs that Merrill Lynch’s apparent indifference to the large volume of wire transfers was in derogation of its own written policies for detecting ‘con games’ and ‘scams,’ . . . [a]t most this conclusion leads reasonably to the inference that Merrill Lynch ‘should have been aware’ of possible wrongdoings in the account.” Id. The court rejects plaintiffs’ reliance on such “constructive knowledge” evidence because that evidence does not prove “actual knowledge.” Id.
Plaintiffs’ fifth category of evidence involved visits to Benistar’s website by Tabbah, perhaps in Stern’s presence. Both denied, at the 2002 trial, seeing any information on the site concerning Benistar’s role as a qualified intermediary for § 1031 plans, and the court concluded that such evidence “has no probative value in establishing Merrill Lynch’s knowledge of the primary wrongdoing.” Cahaly, 451 Mass. at 356 and n.30. Levine testified that he visited the site to look at a page concerning an unrelated tax strategy. Id. There is no evidence that he looked at the §1031 link, alone or with others; in any event, Levine’s testimony adds nothing where the Court has concluded that he already had actual knowledge of Benistar’s wrongdoing.
The Court concludes that reconsideration of the foregoing categories of evidence is not necessitated by evidence at the 2009 or 2010 trials. Accordingly, the Court will not make further findings on evidence the sufficiency of which the Supreme Judicial Court has decided in Cahaly.
3.Nancy Sawyer and Stephen Castillo
Nancy Sawyer was Service Manager (a position previously titled Operations Manager) at the branch from December 1998 to on .or about September 10, 2000, when she left to take a new position with Merrill in Houston. Sawyer’s position was, in her words, “a veiy reactive job ... I had to deal with any kind of administrative assistant issues that needed to be elevated.” 2010 Tr. 3-10. She would coordinate changes in computers and telephones in the event, for example, that “a financial advisor was moving from one side of the office to another or changing assistants . . .” Id. She also had responsibility for client calls. She was not involved in trading, and had no license therefor.
The function that took the majority of Sawyer’s time was document control. She was the person at the branch primarily responsible for reviewing outgoing wires. If a client initiated an outgoing wire transfer request, Sawyer had no authority to prevent the transfer unless funds were unavailable.
Any outgoing wire transfer request greater than $500,000 required an oral confirmation from the client. Sawyer would make the call for verification; when she was out, Rasmussen or, if he was absent, Steven Castillo would make the call. Rasmussen and Castillo did so only several times between 1998 and September 2000.
Sawyer regularly saw and approved the wire transfer requests for the Benistar accounts while she was *6 at the branch. She understood the wire transfers for the Benistar accounts to be for Benistar’s business, which involved sales and purchases of real estate, but did not know what §1031 exchanges were.
Benistar generated a high, if not the highest, volume of wire transfers in the branch. When an outgoing wire transfer request for more than $500,000 came in for the Benistar accounts, Sawyer would call Carpenter to verify the information on the letter of authorization (LOA), and ask if the transfer was “for a closing.” Sawyer was also required to verify with Merrill’s Monetary Control Unit the purpose of the wire transfer, to be sure that the purpose was legal. Her conversations with and communications to Monetary Control reflected her, and its, understanding that the transfers involved legitimate real estate transactions.
Monetary Control is responsible for reviewing large dollar transactions, including wire transfers out of Merrill. When Monetary Control personnel needed additional information about a wire transfer transaction, they would contact the operations department at the branch.
When Sawyer first joined the branch, she would also ask Levine or Janine Del Grosso if the transfer was “for a closing,” and they would confirm that it was. She had no discussion with them regarding whether the funds belonged to Carpenter or third parties. She did not ask Stem about the transfers.
No one ever told Sawyer that the money was coming in “for clients.” Nevertheless, she developed the understanding that “it was clients’ money in the account,” and that Benistar was buying and selling properties on behalf of those clients. 2010 Tr. 3-49, 3-55. She had no understanding as to whether there was anything improper about the transactions involving Benistar, or whether Benistar agreements with the clients would have prohibited Benistar from trading their money. Id., 3-49-50. Indeed, she had no understanding as to the relationship between Benistar and its clients other than as stated above. Id., 3-50.
Sawyer did not discuss with anyone at Merrill her understanding that the money coming into the Benistar accounts was client funds. In particular, she had no reason to discuss that with Tabbah or Rasmussen because that was “(n]ot my side of the business. I had no questions or concerns that would warrant that.” Id., at 3-51. Indeed, she did not discuss Benistar with Rasmussen.
Sawyer did not know about the escrow agreements with Benistar’s clients, and saw no indication that caused her to be concerned that wrongful or improper conduct was occurring.
The Monetary Control unit possessed a 7,700 line spreadsheet that contained a single entry indicating that the Benistar account was a “1031 properly exchange acct.” See 2009 Ex. 1A. The same entry is reflected, at 2009 Ex. 1B, ML-09-003383-3384, in a July 17, 2000 message recorded in the Advanced Service and Processing (ASAP) System, which contains a computerized audit trail of the entire history for each outgoing wire transaction for every account at Merrill. ASAP automatically routed transactions to the appropriate areas of the firm to gather information necessary for approval of a transaction.
The July 17, 2000 ASAP message log records the history of a wire transfer requested by Benistar exceeding $500,000. It reflects that Castillo, in Sawyer’s absence, confirmed that the LOA matched the request itself, and responded to Monetary Control’s follow-up inquiry regarding recent transfers into the account as follows: “Per conv with Stephen [Castillo] OPS Supe [supervisor] this is a 1031 property exchange acct];] wires in from sales and are held at ML untill [sic] another property is purchased.”
Sawyer did not discuss “1031" with Castillo, her assistant, and does not know where Castillo obtained the information reflected in the Merrill ASAP system.
Castillo did not know what a 1031 property exchange was. When shown the pages from 2009 Ex. IB, quoted above, he testified that, to the extent he did not know what the reference to a “ 1031 Property Exchange meant,” he relied on Sawyer and others to understand what it meant. Castillo Dep., Ex. H-4, at 32. The Court credits that testimony.
The Court finds that Castillo, a junior level administrative assistant, was parroting to Monetary Control information about §1031 exchanges of which he had no personal understanding. There is no evidence that he received such information from anyone at the branch, or that he communicated it to anyone but Monetary Control. There is no evidence that anyone at the branch reviewed the July 17, 2000 ASAP message log. Nor is there evidence that anyone at Monetary Control understood any more about §1031 exchanges than was contained in the ASAP message log.
4. Rasmussen
On April 4, 1999, Rasmussen conducted an active account review of the Benistar accounts. In a document disclosed by Merrill in 2009, titled “Account Activity Summary" Rasmussen wrote to Stern “pis comment on activity & account.. . Thx Tom R.” 2009 Ex. 33. Stern replied, “call writing.” Rasmussen then sent a follow-up message: “I would like to speask [sic] to this guy due to the nature of business.” Id.
Plaintiffs argue that Rasmussen’s message, and the few conversations he had with Carpenter, evidence his knowledge that Benistar was trading other people’s money. Merrill counters that “nature of business” refers not to the nature of Benistar’s §1031 property exchange business, but to the nature of Carpenter’s business with Merrill, i.e., options trading.
Even if plaintiffs correctly interpret Rasmussen’s message to refer to the nature of Benistar’s business, neither his message, nor evidence of his conversations *7 with Carpenter, conveys any information about what Rasmussen’s understanding of that business was, and therefore does not persuade the Court that he had actual knowledge that Benistar was trading other people’s money in violation of its contractual and fiduciary duties to those individuals.
E. Events On and After September 20, 2000
Rasmussen had, prior to September 20, discussed Benistar with Jennifer Waddington, in Compliance-Surveillance, providing information to her regarding the Benistar accounts. Benistar was one of the most active accounts in the branch, and Carpenter’s trading strategy and losses in the Benistar account was troubling to Compliance and branch management alike. As of August 2000, the account had losses of nearly $2 million, and margin debt of $1 million.
At Waddington’s direction, Malia had begun to review the Benistar account. Beginning several weeks prior to September 20, Rasmussen and Malia had numerous discussions about the activity and losses in the account.
Rasmussen had learned, in June 2000, that he was being promoted to a new position at Merrill’s Morris-town, New Jersey branch office. His final day at the Fifth Avenue branch was to be September 29, preceded by a transition which included time at his new branch office.
By September 20, the losses in the Benistar account had doubled from the previous month to nearly $4 million. First thing that morning, Malia and Rasmussen reviewed the account, and discussed the heavy losses that the trading strategy in the Benistar account was causing. Malia initially concluded that the account should be restricted to covered call writing only; ultimately, he and Rasmussen agreed that the account should be restricted to closing transactions only. Although ultimate authority for that decision rested with the branch managers, Rasmussen agreed with Malia’s recommendation as to Benistar.
At 10:34 a.m. on September 20, Malia sent an email to Rasmussen, copies to Tabbah, Larry Green (OGC), Chiriani (OGC), Janos, and Hugh McNamara (formerly District Administrator) stating: “Effective immediately, there are to be no further opening option transactions entered for this account. Only liquidating or ACAT instructions will be allowed to be accepted." 2009 Ex. 3.
If Merrill had forced Benistar to close out all of its open positions, Merrill may have effectively forced Benistar to accept certain losses that could have otherwise been avoided. Therefore, absent a request from regulators or a court order, the most severe trading restriction Merrill would place on an account was to restrict the account to closing positions only.
At 10:42 that morning, Levine informed Carpenter that no new positions would be allowed to be established in any of the Benistar accounts, and that Carpenter would be allowed only to close out existing positions.
Also that morning, Malia viewed the Benistar website’s pages describing Benistar’s §1031 business. The evidence raises a question as to whether he did so before or after his initial conversation with Rasmussen that morning, and before or after he sent his 10:34 a.m. email to Rasmussen. In view of what is, and is not, contained in the website’s §1031 pages, the Court concludes that the answer to that question is immaterial.
While those website pages, presented at the 2009 trial, describe Benistar’s business and refer to §1031 exchanges, they do not specifically disclose that the funds in Benistar’s account “were third-party funds contractually required to be held in escrow and that Benistar Trust’s agreements with the third parties did not permit using the funds for speculative trading.” Cahaly, at 353. Thus, while the Benistar website pages which Malia viewed (and other Malia documents) provided circumstantial evidence at the 2009 retrial that was not available to the jury at the 2002 trial, they are not direct evidence of actual knowledge as defined by the Supreme Judicial Court in Cahaly, and, even combined with other circumstantial evidence, do not satisfy the “crucial” evidentiary requirement set forth in Cahaly:
The indirect, circumstantial evidence amassed at [the 2002] trial may suggest that Merrill Lynch knew the nature of Benistar Trust’s business. But it does not erase the evidentiary lacunae between Merrill Lynch’s knowledge of Benistar Trust’s services and knowledge that Benistar Trust was violating its fiduciary agreements to clients and converting client funds by trading in the Benistar Trust corporate account. Crucially, no evidence of Merrill Lynch’s actual knowledge of Benistar’s agreements with its clients was presented at trial.
Id. at 356-57 (emphasis added).
While not evidence of actual knowledge, the Benistar website did cause Malia to be suspicious that Benistar was trading other people’s money without authorization. Malia shared both the §1031 website pages and his suspicions with others at Merrill on September 20. He called Rasmussen to tell him about the website, and soon thereafter, at 11:04 a.m., faxed the pages to Rasmussen with a cover sheet stating “Tom, As we discussed.” 2009 Ex. 2.
Rasmussen saved a copy of Malia’s fax and placed it in a file in the credenza of his administrative manager’s office. Michaelian succeeded Rasmussen in that office, and Anna Roccanova succeeded Michael-ian. In 2009, she found the file in the credenza. Malia saved a copy of the fax he sent, and that copy was in the Malia file that Merrill (through Joseph Pash, in Legal) gave to Merrill’s trial attorney, John Snyder, in 2002.
*8 Malia’s 10:34 a.m. email elicited a response from Green, at OGC, informing Malia that McNamara “is no longer District Administrative Manager for NYCD. The new DAM is Sam Sitdham [sic].” Malia forwarded his email to Stidham, regional administrative manager for the New York region, who replied, “I called in regards to this — whats [sic] the story — Sam.” 2009 Ex. 5.
Stidham and Rasmussen did talk, and Rasmussen likely informed Stidham of the restriction of Benistar’s account, and of his suspicions regarding Benistar. Having followed up to the extent of learning what Malia knew, Stidham’s understanding at the time was that “it was up to the legal department at that point to make sure that Merrill Lynch complied with any internal policies regarding that and any external rules or regulations that might apply.” Stidham Dep., 2010 Ex. H-26, at 113.
Malia also shared his suspicions with Steve Snyder in Compliance-Surveillance. Snyder did not believe that Merrill had proof that Benistar was trading other people’s money without authorization, and he did not know “whether, in fact, it was the owner’s money, whether it was the client’s money, whether, in fact, [Benistar] had the right to do this as an investment.” Snyder Dep., 2010 Ex. H-22, at 26. Snyder believed that the branch had appropriately restricted the Benistar account because of the activity and losses in the account.
Malia also spoke to Janos about his suspicions; Janos has no memoiy of that conversation.
Malia also discussed his suspicions with Modesto Moya in AML. Moya had previously investigated suspected money laundering in an account that involved §1031 exchanges. After talking with Malia, Moya shared Malia’s suspicions that Benistar was trading other people’s money without authority; however, Moya did not believe that the facts of the Benistar accounts as reported by Malia presented an AML issue, did not consider that Malia had referred the Benistar matter to AML for further action, and expected that Malia would report his suspicions to his superiors in Compliance.
On September 22, 2000, Carpenter faxed a letter to Rasmussen objecting to “Merrill’s Options Compliance Department’s decision to prohibit [Benistar] from opening any new positions in our account . . .”2010 Ex. 15. The Supreme Judicial Court has ruled that, even though that letter states, “ ‘We have chosen Merrill [Lynch] as our depository for our clients so we cannot move the funds elsewhere ... ,’ it takes a leap in speculation, an impermissible leap for a jury, to tie the September 22 letter to Merrill Lynch’s ‘actual knowledge’ of the underlying tortious behavior.” Cahaly, 451 Mass. at 353. The court identified eviden-tiary gaps requiring that impermissible leap:
The link posited by the plaintiffs requires many intermediate conclusions for which there was no evidence: for instance, that the funds in the Benistar Property account were third-party funds contractually required to be held in escrow and that Benistar Trust’s agreements with the third parties did not permit using the funds for speculative trading. Even assuming, arguendo, that the letter signified that Benistar Trust had some unspecified fiduciary duty to third-party clients relevant to the corporate accounts, the “relevant ‘knowledge’ for liability to attach in a fiduciary’s breach of duty is knowledge as to the primary violator’s status as a fiduciary and knowledge that the primary’s conduct contravenes a fiduciary duty” (emphasis added).
Id. (citation omitted). As before, this Court will not make further findings on evidence the sufficiency of which the Supreme Judicial Court has decided in Cahaly.
By September 25, 2000, Rasmussen had sent Carpenter’s September 22 letter to representatives of Compliance (Malia), and Legal (Kevin Duffy), the latter because Malia viewed Carpenter’s letter as a customer complaint. On September 25 Rasmussen called Duffy and, in a very brief conversation, asked Duffy to “help him fire a client as a lawyer.” Duffy Dep., 2010 Ex. H-6, at 33. Malia did not discuss with Duffy the website or his suspicions regarding Benistar. Together they called Carpenter, who told them that it was his money and he could do anything he wanted with it. At the time, Duffy did not know that anyone at Merrill had seen the website or suspected that the Benistar accounts contained third-party funds.
On September 27, Malia asked Tabbah to obtain from Stern and Levine a “confidential to counsel” letter regarding their knowledge about Benistar’s “managing other people’s money.” 2010 Ex. 7. Tabbah transmitted Malia’s request in an email to Rasmussen, who on September 28 (one day before his last at the branch) forwarded it to Stem and to Sal Campione, who was to fill in as administrative manager until Michaelian started in mid-October.
On the morning of October 2, Campione forwarded Rasmussen’s email to Stern and Levine with the message “Gary, Jerry — It is very important that we get these letters by this afternoon.” 2010 Ex. 7. Shortly after sending that email, he followed up with one to Del Grosso: “Jenny, Make sure the boys write this memo.” Id. Levine and Stern produced the “confidential to counsel” memo, and Campione faxed it to Malia, the same day. Levine and Stem also produced an identical memo, but addressed “to whom it may concern.”
The memo which Levine and Stern wrote October 2 states that they “have been under the assumption that the money [Carpenter] has been investing has been his own.” It says nothing about any knowledge that Benistar was managing other people’s money.
Malia saved a copy of the “confidential to counsel” memo, and that copy was in the Malia file which Pash gave to John Snyder in 2002. A copy of the “to whom *9 it may concern” memo was saved in a file in the credenza of the administrative manager’s office, probably by Campione. It was among the documents found in the credenza in the then-administrative manager’s office in 2009. There is no evidence that either version of the memo was distributed to anyone else at Merrill.
In 2009, Malia’s September 20 fax to Rasmussen, along with printouts of the Benistar website pages, the print-out of the email from Tabbah to Rasmussen, the email chain requesting the confidential to counsel memo, and the brokers’ response to that request, were located in the office of the administrative manager of the branch, Anna Roccanova, together with court documents and other Benistar-related documents, including many documents created after October 2, 2000.
In October Carpenter, seeking a new brokerage firm for the Benistar accounts, asked Levine if he knew anyone with options expertise. Levine referred Carpenter to Stern, who spoke to his friend Mitchell Rock at PaineWebber to see if he would be interested in taking the Benistar accounts. Rock indicated that he would like the accounts. Stern’s contact with Rock violated Merrill policy.
The Benistar accounts were transferred to PaineW-ebber by wire transfer and ACAT between October 9 and October 27, 2000. ACAT is an automated process by which accounts are sent from one brokerage firm to another. An ACAT transfer is executed without any action by any person at the sending firm if the information received from the requesting firm matches the account information at the sending firm. An entire account, including securities and cash, can be transferred using ACAT.
Between September 20 and the transfer of Benistar’s accounts to PaineWebber, Stem provided some advice to Carpenter about which options to liquidate and which to hold. Merrill executed wire transfers from the account as before. In that period, the Benistar accounts lost an additional several hundred thousand dollars.
Rasmussen played no role in the transfer of the accounts, and did not know that Stern had reached out to Rock. Similarly, Tabbah played no role in the transfer, and did not know that Stern had contacted Rock for that purpose until after the accounts had transferred.
Benistar could have opened an account at any one of many brokerage firms without any action by Merrill, and could have deposited new funds at that firm.
Merrill did not have the authority to refuse a client request to transfer its account outside of Merrill without a court order or a request from regulators or law enforcement officials, even when Merrill strongly suspected that one of its customers was stealing money from that customer’s accounts. Merrill would voluntarily delay transfer in such a case to allow authorities time to seek a court order freezing an account.
Prior to 2001, Merrill did not report to any regula-toiy or law enforcement agency that Benistar had been trading third-party funds without authority. Except for Levine, no one at Merrill had actual knowledge of that fact. In particular, after September 20, 2000, Rasmussen and Tabbah, managing agents of Merrill, knew the nature of Benistar’s business as reflected on Benistar’s website, but did not have actual knowledge of Benistar’s agreements with its clients, or of Benistar’s breach of its duties under those agreements. This finding is unaffected by subsequent events in the litigation of this case.
Neither Malia, nor anyone with whom he shared the information he discovered on the Benistar website on September 20, reported that information, or suspicions that Benistar was trading other people’s money without authority, to any person in OGC authorized under Merrill policy to report such suspicions to the authorities.
Following disclosure of the Patterson documents in 2004, Merrill instituted no new training to address and prevent the circumstances which led to Levine’s knowledge and assistance of Benistar’s wrongdoing. Merrill adopted no new policies to prevent the loss of critical customer information such as that contained in the Patterson documents. Such policies and training would reduce in a significant way the likelihood of a recurrence of MerriH’s knowing assistance of wrongdoing by a Merrill customer.
II. Consequential Damages A. Cahaly, Bellemore Associates, LLC, and Iantosca
With regard to plaintiffs Gail Cahaly, Bellemore Associates, LLC, (Bellemore), and the Iantosca defendants (Joseph Iantosca, individually and as trustee of Faxon Heights Apartment Realty Trust and Fern Realty Trust, and Belridge Corporation) (collectively, Iantosca), the parties have stipulated as follows (see Ex. 1242):
In lieu of the lost escrow funds, Cahaly purchased the replacement property at 634 Commonwealth Avenue, Newton, Massachusetts, with two mortgages from Hingham Institute for Savings, one on the replacement property and one on another property, located at 1391-1397 Washington Street and 5-7 Lucas Court, Newton.
Cahaly paid $545,386.22 in interest on the two mortgages from 2001 through June 2008, which is the month Cahaly received a settlement payment as a result of the arbitration proceeding against UBS PaineWebber (PaineWebber Proceeds). To the extent that the Court decides that the PaineWebber Proceeds should be allocated to compensatory damages, the amount of Cahaly’s alleged consequential damages claim will be capped at $545,386.22.
*10 Cahaly has continued to pay interest on the two mortgages since June 2008.
To the extent that the Court decides that the Paine-Webber Proceeds (and/or other funds received in connection with this litigation) should be allocated to punitive damages, the amount of Cahaly’s interest expense that constitutes alleged consequential damages will increase after June 2008, and shall be calculated as the actual amount of interest paid on the two mortgages through the date Cahaly is deemed to have recovered in full her compensatory damages.
Bellemore purchased its replacement property, 18 and 30 Lamy Drive, and 9, 10, 11, and 15 Lance Drive, Goffstown, New Hampshire (an industrial park), with borrowed funds to make up for its lost escrow funds. To do so, Bellemore increased from $400,000 to $600,000 a second mortgage taken back from the seller of the replacement property.
Bellemore paid $53,499 in interest on the increased amount of the second mortgage from 2001 until the date of its payoff in November 2003.
Iantosca completed the purchase of his replacement property, a shopping plaza located on South Washington Street, North Attleborough, Massachusetts.
In lieu of the lost escrow funds, Iantosca obtained a loan from Eastern Bank secured with a mortgage on property owned by Iantosca located at 325 Wood Road, Braintree.
Iantosca paid $39,600 in closing costs and $336,808.36 in mortgage interest on the loan, which he paid off in or about December 2001. Iantosca incurred a prepayment penally of $50,000. The total of these expenses is $426,408.36.
B. Jeffrey M. Johnston
Plaintiff Johnston is a principal of Cathartes Private Investments (Cathartes), a real estate and development company. He has been employed by Cathartes since 1995. He has worked extensively in the real estate market, and holds a masters degree in real estate from MIT.
Johnston’s duties at Cathartes include performing financial analyses on prospective properties. To perform those analyses, Johnston considers the economics of the transaction, lease comparables, and market research. He has performed hundreds of such financial analyses for prospective real estate transactions in his time at Cathartes.
Johnston has experience with and is knowledgeable about Boston’s Financial District real estate market, and has performed the financial analyses for the various Washington Street properties purchased by Cathartes.
In late 2000 and into early 2001, Johnston, on his own behalf, intended to perform a §1031 property exchange with the proceeds from the November 2000 sale of a condominium he owned at 21 Wormwood Street, Boston. He deposited the proceeds from the sale, $541,930.74, with Benistar (the Benistar Funds), which was to serve as the qualified intermediary for the intended §1031 exchange. To complete that exchange, Johnston was required by January 4, 2001, to identify up to three possible replacement properties that he might purchase with the proceeds of the Wormwood Street sale.
Johnston identified three potential replacement properties on January 4, 2001: 330 Washington Street, Boston (Washington St. Property), and properties on Salem St. in Lynn, and Pillsbury St. in Concord.
Johnston was required to purchase one or more of these properties by April 17, 2001, in order to comply with the 180-day IRS deadline and complete the §1031 exchange.
Johnston alleges that, although he identified three possible properties, he would have purchased the Washington St. Property if the Benistar Funds had been available.
Johnston never made a binding offer to purchase the Washington St. Property. Rather, in January 2001 he sent two letters to Joe Levanto (Levanto), the broker representing the seller of that property. Johnston’s letters proposed a process pursuant to which Johnston or his associates would investigate and might, or might not, choose to purchase the Washington St. Property. Johnston’s letters requested the seller’s agreement to undertake this process. The letters expressly state that they create no binding legal obligation on either party, other than one of confidentiality; thus, agreement to Johnston’s proposal would not obligate Johnston or the seller to enter a purchase and sale agreement or otherwise to complete a transaction, nor would it restrict the seller from continuing to market the property to other potential purchasers.
Johnston testified that he sent his two letters to Levanto on January 10 and 15, 2001. Neither of his non-binding offer letters, nor any offer to purchase the property, was ever accepted by the seller or its representatives. Even if Levanto had recommended the proposed arrangement to the seller, there is no evidence that the seller would have agreed with the recommendation. Levanto had no authority to accept Johnston’s proposal without approval of the seller. No price was agreed to in the event the parties went forward with Johnston’s proposal.
On January 17, 2001, Johnston learned that the Benistar Funds were not available. He took no further steps to purchase the property after that time, including performing any due diligence under his proposed agreement. Nor did Johnston seek alternate financing, although he had assets available for that purpose had he chosen to use them. Meanwhile, Levanto was probably communicating with other potential buyers.
Johnston alleges that his inability to purchase the Washington St. Property, which he intended to hold *11 for three years, caused him consequential damages in the form of lost profits. Specifically, he claims that Merrill’s aiding and abetting of Benistar’s wrongdoing caused him to lose profits that he would have realized from the purchase of the Washington St. Property in the amount of $1.157 million. His calculation of that amount assumes a purchase price for the property, and applies various cash flow and other assumptions.
For example, his analysis assumes that he would have sold the property in three years. He testified, however, that it was “impossible” to know how long he would actually have held the property. 2010 Tr. 2-5. Johnston’s analysis also assumes that the property would be subject to a long-term lease at a set rental with Venator Group Retail, Inc. d/b/a/ Foot Locker, but there was no evidence that such a lease was signed. The analysis assumes that the second, third and fourth floors would be rented at a specified rate; in early 2001, the third and fourth floors were vacant, and likely difficult to lease because there was no elevator in the building.
Johnston’s analysis projected the price at which he expected to sell the Washington St. Property on the basis of his projection of cash flow from the building, which in turn was based on the above and other assumptions.
A finding in Johnston’s favor, both as to the likelihood that he would have in fact reached agreement with the seller to purchase the Washington St. Property, and if so, any likely profit therefrom, in the Court’s view must rest on impermissible speculation. Accordingly, the Court concludes that Johnston has failed to prove consequential damages.
C. Massachusetts Lumber Company, Inc.
Plaintiff Massachusetts Lumber Company, Inc. (Mass. Lumber) entered into a §1031 property exchange agreement with Benistar on September 14, 2000 in connection with Mass. Lumber’s sale of its property at 170 New Boston Street, Woburn (Woburn Property). Mass. Lumber deposited the sale proceeds of $3,287,190 with Benistar.
In order to complete its §1031 exchange, Mass. Lumber was required by October 28, 2000 to identify up to three replacement properties it might purchase. On October 12, 2000, Mass. Lumber identified three potential replacement properties: (1) Pine Tree Shilling Office Building in Exeter, New Hampshire (Exeter Property); (2) Salem Green Office Building in Salem, Massachusetts (Salem Property); and (3) Atlantic Mall, Star Market and Sears Roebuck in North Reading, Massachusetts (Atlantic Property).
In order to complete the §1031 exchange, Mass. Lumber was required to purchase some combination of those three properties, exhausting the full amount of its proceeds from the Woburn Property, by March 12, 2001.
Prior to that date Mass. Lumber entered into a purchase and sale agreement on the Exeter Property, the completion of which sale would have required about one-third of the §1031 proceeds. In late Januaiy 2001, Mass. Lumber rescinded its purchase and sale agreement on the Exeter Property, citing environmental concerns. Upon the rescission, Mass. Lumber received back its $50,000 deposit.
Mass. Lumber’s owner and president, Eliot Snider, is uncertain whether Mass. Lumber would have purchased the Exeter Property even if the funds deposited with Benistar had been available. Moreover, his efforts toward possible purchase of the Salem Property and Atlantic Property were preliminary at most, and he does not know whether Mass. Lumber would have purchased either of those properties even if the funds deposited with Benistar had been available.
Snider mistakenly believed that Mass. Lumber could complete the exchange by purchasing a property or properties other than the three which Mass. Lumber had identified. Accordingly, he continued looking for additional replacement property after the 45-day deadline for identifying such property had passed. Mass. Lumber has taken the position that it would have purchased some combination of eight properties with the funds it deposited with Benistar, five of which were not included in its October 12, 2000 identification.
On Januaiy 17, 2001, Mass. Lumber received notice that its Benistar funds were not available. Mass. Lumber has not proved which of the eight potential properties it would have purchased with the funds, how much it would have paid for the properties, or when it would have sold them. Nor did Mass. Lumber use its significant resources to purchase any of the three replacement properties after learning that its Benistar funds were not available.
Mass. Lumber recorded a capital gain on the sale of its Woburn Property in the year 2000. It paid $11,247 and Snider paid $194,943, in state and federal taxes on that gain. Had Mass. Lumber successfully completed the property exchange, those taxes would have been deferred until some later, unspecified time. There would be an offsetting reduction in the amount Mass. Lumber could deduct as depreciation on whatever new property it purchased.
Thus, any financial harm to Mass. Lumber would be the time value of money paid as taxes in 2000 compared to deferral of those amounts under §1031, offset by the additional tax that would have been paid as a result of reduced depreciable basis on the replacement property. Because Mass. Lumber has failed to prove which properties it would have purchased, whether those properties would have qualified as replacement properties under §1031, whether those properties would have gained or lost value, and when Mass. Lumber would have chosen to sell them, it has failed to provide any basis other than speculation *12 upon which to determine its claim for consequential damages.
III. Allocation of the PaineWebber Settlement
On June 7, 2010, the parties filed a “Stipulation Regarding Allocation Motion,” setting forth the following agreed facts.[6]
Benistar is a judgment debtor of the plaintiffs in this lawsuit.
In or about 2005, plaintiffs prosecuted an arbitration claim in the name of Benistar against PaineW-ebber.
In 2008, plaintiffs received $12,487,000 in connection with a settlement of the arbitration claim. Plaintiffs have also received $113,543.76 from a Benistar bank account, and $150,000 from a settlement with Martin Paley (collectively, Settlement Proceeds). In consideration for the Benistar defendants’ agreement to the direct payment of the settlement amount by PaineWebber to plaintiffs, plaintiffs gave Benistar a credit of $15,000,000.
IV. Attorneys Fees and Costs
On January 5,2011, the parties informed the Court that “(p]laintiffs and Merrill Lynch have reached an agreement concerning the amount of attorneys fees and costs reasonably incurred by plaintiffs in prosecuting their claims against Merrill Lynch, which if approved by the Court, will obviate the need to further consider the appropriate amount of fees and costs should the Court conclude that an award of fees and costs is appropriate under the Connecticut Unfair Trade Practices Act (“CUTPA”), the New York Unfair Trade Practices Act (“NYCPA’j, or as a sanction for alleged litigation misconduct by Merrill Lynch or its former counsel, Bingham McCutchen.”[7]
The amounts upon which the parties agree are fees of $8,015,000, and costs of $685,000, for a total of $8.7 million.
The parties state that their agreement is contingent on the Court’s approval of it; is otherwise not an admission by either parly, including that an award of attorneys fees and costs in either this proceeding or the sanctions proceeding is or is not warranted; has no bearing on plaintiffs’ claims for sanctions against Merrill and Bingham McCutchen beyond specifying the amount of plaintiffs’ fees and costs that may be considered if the Court chooses to award sanctions; has no bearing on attorneys fees and costs for plaintiffs Reply Brief on their application for fees and costs, or on applications for any such future fees or costs; and is not intended to impact or limit any appeal of any ruling other than the Court’s adoption of the agreed amount as reasonable.
Subject to the qualifications agreed to by the parties as summarized above, the Court adopts the amounts agreed to by the parties as reasonable attorneys fees and costs incurred by plaintiffs in prosecuting their claims against Merrill.
RULINGS OF LAW
The Court makes the following rulings with regard to punitive damages, consequential damages, allocation of the PaineWebber settlement, and attorneys fees and costs.
I. Punitive Damages
The Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. §42-110a et seq., provides, at §42-110g:
(a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action ... to recover actual damages . . . The court may, in its discretion, award punitive damages . . .
CUTPA further provides, at Section 42-110b:
(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.
(b) It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USC 45(a)(1)), as from time to time amended.
[[Image here]]
(d) It is the intention of the legislature that this chapter be remedial and be so construed.
In the 2009 retrial of plaintiffs’ claims against Merrill, a jury determined that Merrill had “engage[d] in or commitfted] one or more unfair or deceptive trade practices in connection with its dealing with the Benistar accounts held at Merrill Lynch,” and that Merrill’s conduct had caused injury to plaintiffs. Special Jury Verdict, Part IV.
Before considering whether, in its discretion, the Court will award punitive damages under CUTPA,[8] the Court addresses the parties’ contentions regarding the scope of permissible punitive damages in this case, i.e., (a) plaintiffs’ contention that the conduct for which Merrill is to be punished includes not just acts of substantial assistance, with actual knowledge, by one or more of Merrill’s employees, but also any acts of reckless disregard for the plaintiffs’ rights which plaintiffs have proved at trial; and (b) Merrill’s contention that, even as to Levine’s conduct, Merrill may not be held vicariously liable for punitive damages because no managing agent of Merrill participated in, authorized, or ratified Levine’s conduct.
A. Scope of Conduct for Which a Punitive Award is Permissible
Plaintiffs contend that, to the extent that the Court finds that Rasmussen or Tabbah—both of whom Merrill admits to have been managing agents—"acted with *13 reckless disregard for the rights of the plaintiffs, . . . punitive damages are appropriate."[9] Plaintiffs’ Response to Merrill Lynch’s Post-Trial Brief (Plaintiffs’ Response), at 7. Plaintiffs further argue, id., n. 2, that
there is no authority for the proposition Merrill Lynch advances that plaintiffs must prove that one particular managerial agent had actual knowledge of Benistar’s scheme and substantially assisted the scheme. [Merrill Lynch’s Post Trial Brief Concerning Plaintiffs’ Damage Claims, p. 10.) While that is the standard this court adopted as the burden of proof for aiding and abetting (over plaintiffs’ objection), plaintiffs need only meet the standard set by Connecticut law for punitive damages under CUTPA—i.e. that Merrill Lynch acted with reckless disregard for the rights of others.
The Court notes that “Plaintiffs’ Proposed Jury Instruction No. [12] — CUTPA,” submitted during the 2009 trial, requested that the Court give the following instruction (which is substantially identical to that given by Judge Botsford at the 2002 trial): “The Plaintiffs also claim that Merrill Lynch violated [CUTPA] by knowingly participating in or assisting Benistar Property’s acts of using the Plaintiffs’ funds to engage in unauthorized and risky stock option trading that resulted in the loss of those funds.” The instruction then sets out the elements of the claim.
The Court gave plaintiffs’ requested instruction to the jury in 2009.[10] Thus, the juiy’s verdict on plaintiffs’ CUTPA claim is based on plaintiffs’ specific alleged violation, that is, Merrill’s “knowingly participating in or assisting” Benistar’s malfeasance. It was that violation which the jury—which is presumed to have followed the Court’s instructions—found constituted “one or more unfair acts or practices in the conduct of its stock brokerage business,” Plaintiffs’ Proposed Juiy Instruction No. [12], and caused plaintiffs injury.
The upshot of the foregoing is that any punitive damages which the Court, in its discretion, allows, will be those deriving from the conduct which the jury in 2009 found to have violated CUTPA. As the Court has found above, the only evidence supporting the juiy’s verdict on the aiding and abetting and statutory claims was that relating to Patterson and Levine.
B. Vicarious Liability for Punitive Damages Under CUTPA
Merrill contends that, even if Levine’s conduct alone would otherwise expose Merrill to punitive damages under CUTPA, Connecticut common law provides that, “to impose punitive damages on a corporate defendant, the longstanding Connecticut rule requires a showing both that: (1) a corporate agent engaged in outrageous conduct, and (2) a managerial agent participated in, authorized or ratified that misconduct." Merrill’s Post-Trial Brief, at 5-6 (emphasis in original).
That common-law principle applies to punitive damages awarded under CUTPA, Merrill argues, “because the clear rule of construction, set forth in a long and unbroken line of Connecticut Supreme Court cases, is that statutes are presumed to incorporate common-law standards unless the intention to depart from the common law ‘is clearly and plainly expressed.’ ’’ Id. at 6, quoting Matthiessen v. Vanech, 266 Conn. 822, 838-39 (2003); see also Hunte v. Blumenthal, 238 Comm. 146, 153 (1996), where the Court stated: “In the absence of guidance from the language of the statute or the legislative histoiy, we look to common law principles ... It is assumed that all legislation is interpreted in light of the common law at the time of its enactment” (internal quotation marks and citations omitted).
Plaintiffs contend that CUTPA’s punitive damages provision does not import Connecticut’s common-law vicarious liability rule, because the Connecticut Supreme Court has described CUTPA as “sweeping” and “expansive,” and has held that “CUTPA has its roots not in the common law, but rather in §5(a)(l) of the FTCA [Federal Trade Commission Act], itself an expression of Congress’s intent to identify and prevent a wide range of business conduct not actionable at common law.” Assoc. Inv. Co. L.P. v. Williams Assocs., 230 Conn. 148, 159 (1994); see Plaintiffs’ Response, at 3.
Connecticut’s appellate courts have apparently not resolved whether CUTPA imports Connecticut’s common law limiting vicarious liability for punitive damages, or instead imposes, without restriction, vicarious liability for such damages on corporations whose agents violate CUTPA. In Kalinowski v. Waddell & Reed, Inc., 1998 WL 800241 [23 Conn. L. Rptr. 172] (Conn.Super.) (unpublished decision), a Connecticut Superior Court judge allowed a motion by the defendant, “as the principal of alleged intentional tortfeasor David Stevenson,” id. at *1, to strike plaintiffs prayer for punitive damages under CUTPA. Noting that the plaintiffs had failed to allege that the defendant “itself acted wantonly or wilfully with respect to its agents’ underlying conduct,” the court stated that “[i]n Connecticut, punitive damages cannot be awarded against a principal where, as here, its liability is based solely on a theoiy of respondent [sic] superior or vicarious liability. Maisenbacker v. Society Concordia, 71 Conn. 369 (1899).” There is no indication that the argument presented by Merrill here, based on Connecticut appellate law, was before the court in Kalinowski, nor does the court address it.
Thus the Court will examine cases cited by plaintiffs and Merrill to discern whether the legislature’s imputed intent to “identify and prevent a wide range of business conduct not actionable at common law,” Assoc. Inv. Co. L.P., at 159, trumps the failure of CUTPA’s simple provision for punitive damages (“[t]he court may, in its discretion, award punitive damages *14 . . .’’) to “clearly and plainly” express the intention to depart from the common law. Matthiessen, at 838-39.
While CUTPA does not have its “roots” in the commonlaw, Assoc. Inv. Co. L.P., at 159, Connecticut’s appellate courts have made it plain that CUTPA of necessity imports some common law principles. For example, in Neilsen v. Wisniewski, 32 Conn. App. 133 (1993), the court, considering the standard of proof necessary to establish punitive damages under CUTPA, held that clear and convincing proof is not the appropriate standard
whenever claims of tortious conduct have serious consequences or require the proof of willful, wrongful or unlawful acts. Our Supreme Court has stated that “[a]bsent evidence of legislative intent to the contraiy, we continue to presume that when a statutory private right of action includes multiple damages, the plaintiffs burden of proof is the same as that in other tort cases.” Freeman v. Alamo Management Co., 221 Conn. 674, 683 (1992). The ordinary preponderance of the evidence standard was thus appropriate here. Id., at 678.
It is notable that, while the court found no difficulty applying the common-law tort standard of proof to claims for punitive damages under CUTPA, neither was the court confronted with a common-law principle which, if applied to CUTPA, would tend to undermine the purpose of CUTPA to “identify and prevent a wide range of business conduct not actionable at common law,” Assoc. Inv. Co. L.P., at 159. Put another way, applying the lower preponderance standard, rather than the clear and convincing standard, results in broader protection for victims of conduct which CUTPA proscribes, because the lower standard makes it easier for them to establish their claims. Query whether, if the common-law standard of proof for punitive damages had required clear and convincing evidence, the court in Neilsen would have applied that higher standard to punitive claims under CUTPA.
In any event, Neilsen is a case in which the failure of CUTPA to address the standard of proof for a punitive damages claim results in a ruling that the common-law standard of proof governs.
In Hinchliffe v. American Motors Corporation, 184 Conn. 607 (1981), upon which plaintiffs rely, the Connecticut Supreme Court addressed several fundamental issues raised by the then eight-year-old statute. The principal issue on appeal was whether a plaintiff must prove actual damages in a particular amount in order to pursue an action under CUTPA, where the statute requires only that a plaintiff allege “ascertainable loss.” §42-110g(a).
Hinchliffe had purchased a new Jeep vehicle from defendant which the latter had advertised as “full-time four-wheel drive.” Id. at 610-11. In actuality, the Jeep’s four-wheel drive system created loss of traction in certain circumstances, which the court held “could support a conclusion that the representation that the vehicle had ‘full-time four-wheel drive’ was deceptive under [CUTPA].” Id. at 611-12. Noting that the legislature had used the terms “ascertainable loss” to describe the showing a plaintiff must make to pursue his claim, and “actual damages” to describe what the plaintiff might recover, the court concluded that the legislature had purposely distinguished the two terms in the statute, making it easier for a plaintiff to sue under CUTPA. Accordingly, the court held that “the words ‘any ascertainable loss’ as used in this section do not require a plaintiff to prove a specific amount of actual damages in order to make out a prima facie case.” Id., at 612-13.
The court found support for its holding not only in the language of the statute, but also in the legislative intent underlying CUTPA. After recounting the “somewhat uneven development of common-law liability for innocent misrepresentation,” the court stated that,
[a]gainst this background, the legislature enacted CUTPA, announcing that “(i)t is the intention of the legislature that this chapter be remedial and be so construed.” The act is aimed at eliminating or discouraging “unfair methods of competition and unfair or deceptive acts or practices.” The act proscribes a broader range of conduct than did the common-law action for innocent misrepresentation . . . For the plaintiff victimized by such conduct, CUTPA provides an action more flexible and a remedy more complete than did the common law.
Id. at 616-17 (citations omitted).
For present purposes, it is notable that in Hinchliffe the express language of the statute—"ascertainable loss"—supports the broader remedy (in that case, broader than the common-law liability for innocent misrepresentation) which the legislature stated is CUTPA’s purpose. The court next observes:
The plaintiff who establishes CUTPA liability has access to a remedy far more comprehensive than the simple damages recoverable under common law. The ability to recover both attorneys fees . . . and punitive damages . . . enhances the private CUTPA remedy and serves to encourage private CUTPA litigation. The legislative history . . . demonstrates that CUTPA seeks to create a climate in which private litigants help to enforce the ban on unfair or deceptive trade practices or acts. To interpret CUTPA narrowly, perhaps on the ground that a victimized consumer has other, less complete, remedies available to him, effectively negates this legislative intent.
Id. at 617-18.
While the quoted language might be interpreted as a comment on the scope of punitive damage awards, the Court is not persuaded that Hinchliffe supports plaintiffs’ position. Rather, Hinchliffe is a case in which the court determined that the language of the statute, in light of the legislative purpose, creates broader remedies than existed at common law. In that context, *15 Hinchliffe’s ruling that one bringing a CUTPA claim for misrepresentation “need not, as they would under the common law, prove reliance or that the representation was part of the basis of the bargain,” Plaintiffs’ Response, at 3, is less pertinent to the present case, where the statutory language gives no indication as to whether the scope of punitive damages under CUTPA is to be broader than under common law.
In the absence of such language, plaintiffs must rely on cases which either state CUTPA’s more general legislative purposes in other contexts, or interpret other statutes not directly applicable to the precise question in this case.
On balance, the Court concludes that CUTPA does not negate the limitation which Connecticut common law places on vicarious liability for punitive damages. Accordingly, Merrill may not be held vicariously liable for the actions of Levine where the Court has found that no managerial agent of Merrill knowingly participated in, authorized, or ratified Levine’s conduct.
Nonetheless, the question of whether the common law of vicarious liability for punitive damages applies to CUTPA claims is, in the Court’s view, a close one. For that reason, the Court concludes that it should state now its decision on the amount of punitive damages to be awarded in the event that Connecticut law is determined hereafter to be contrary to this Court’s interpretation.
C. Amount of Punitive Damages
The standard for awarding punitive damages under CUTPA was established in Gargano v. Heyman, 203 Conn. 616 (1987):
Awarding punitive damages . . . under CUTPA is discretionary ... In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence.
Id., at 622 (quotation marks and citations omitted).
In Staehle v. Michael’s Garage, Inc., 35 Conn.App. 455 (1994), the court noted that
[a]lthough [CUTPA] provides no guidance as to a method for determining the amount of a punitive damages award, several methods have gained acceptance by the courts. The method used in this case for determining punitive damages was to award an amount equal to the plaintiffs actual damages. This is a recognized method for determining punitive damages under CUTPA. It is not an abuse of discretion to award punitive damages based on a multiple of actual damages.
Id., at 463 (quotation marks and citations omitted).
The plaintiffs argue for punitive damages based on a percentage of the net worth of Merrill (now owned by Bank of America): see, e.g., Plaintiffs’ Proposed Rulings of Law for the Punitive Damages Phase, at 4. Such awards are appropriate when the particular circumstances of a case, including the outrageousness of the behavior, the level of participation therein by corporate employees, and the breadth and depth of the damage done to victims, merit them.
The Court concludes that this is not such a case. The conduct which the Court has found constitutes the CUTPA violation is the conduct of one Merrill employee, Levine. While Levine’s conduct certainly evinced “a reckless indifference to the rights of others,” and caused plaintiffs substantial financial injury, it does not in the Court’s view partake of the “wanton and malicious injury, evil motive and violence” that in other cases warrant a heavy punitive award. Indeed, Levine’s conduct is most readily explained by his desire to obtain and keep Benistar as a lucrative client, and his reckless indifference in pursuit of that desire, rather than any evil intentions towards plaintiffs. Notable also is the relative pittance which Levine received as compensation from Merrill, compared to, for example, Stem.
The Court is of course troubled by the pervasive ignorance and unresolved suspicions, among Levine’s superiors, of Benistar’s wrongdoing: had Tabbah or Rasmussen, for example, taken the trouble to investigate red flags that became increasingly apparent in the latter part of 2000, they would most likely have discovered what Levine already knew. As the Court has determined above, however, Merrill’s liability for punitive damages is established not by what its employees could or should have known, but by what they actually knew.
Also troubling is Merrill’s failure to create and implement additional training and accompanying policies to prevent a repeat of the kind of conduct that occurred in this case.
For the reasons stated above, and in the exercise of its discretion, the Court mies that, in the event Connecticut law is determined to impose vicarious liability on Merrill for the conduct of Levine as found above, the Court’s award of punitive damages to plaintiffs would be an amount equal to plaintiffs’ actual damages, both compensatory and consequential.
II. Consequential Damages
In order to recover consequential damages under New York law, plaintiffs must prove causation; that the existence of damage is reasonably certain; and that the damages were foreseeable and within the contemplation of both parties. In addition, plaintiffs must prove the amount of the damage with reasonable certainly. See Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d 89, 111 (2d Cir.2007). Consequential damages may not be awarded if they *16 are “merely speculative, possible or imaginary,” or based on “speculative assumptions.” Toltec Fabrics, Inc. v. August, Inc., 29 F.3d 778, 781 (2d Cir. 1994) (citation omitted).
With respect to causation, plaintiffs must show that the damages were the “natural consequences of ... a tortious act.” Levine v. American Federal Group, Ltd., 580 N.Y.S.2d 287, 288 (N.Y.App.Div. 1992).
Merrill argues that, in addition, consequential damages may not be awarded in excess of prever diet statutory interest, citing Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co., 697 F.2d 481, 485 (2d Cir. 1983), and McCoy v. Goldberg, 810 F.Sup. 539, 547 (S.D.N.Y. 1993). Those cases are inapposite, because they involved whether statutory interest should be added where pre-verdict interest or its equivalent had already been added by the court (Bulk Oil, at 485) or a jury (McCoy, at 547). This case does not present the “double recovery” which those cases proscribe.
A.Cahaly, Bellemore, and Iantosca
As noted above, the parties agree that Cahaly, in lieu of the lost escrow funds, purchased the replacement property with two mortgages, on which she paid interest of $545,386.22. In view of the Court’s decision below regarding the allocation issue, Cahaly has proved and is entitled to consequential damages in that amount.
The parties have also agreed that Bellemore paid $53,499 in interest on the increased amount of the second mortgage on the replacement property from 2001 until the date of its payoff in November 2003. Bellemore has satisfied the elements of consequential damages in that amount.
Finally, the parties agree that Iantosca incurred expenses of $426,408.36 in order to complete the purchase of his replacement property. He has established that amount of consequential damages.
Merrill argues that “Cahaly and Iantosca cannot recover any alleged damages resulting from money deposited with Benistar that was never held at Merrill Lynch. Merrill Lynch’s conduct did not cause these losses because Merrill Lynch had no control over the funds originally deposited with PaineWebber. As such, Merrill Lynch’s conduct was not a substantial factor in bringing about these damages.” Merrill’s Post-Trial Proposed Conclusions of Law for the Damages Proceeding, at 8. Merrill’s argument was disposed of in 2009 by the jury’s finding that Merrill’s conduct was “a proximate cause of injury or harm to” Cahaly and Iantosca. Special Jury Verdict, Q. 3 et seq.
B.Johnston
The Court has found that the fact of any likely agreement with the seller of the Washington St. Properly, and if so, of any likely profit therefrom, rest on impermissible speculation. Accordingly, Johnston has failed to satisfy the elements of his claim for consequential damages.
C.Mass. Lumber
The Court has found that Mass. Lumber’s claim rests on speculation as to whether it would have successfully completed the property exchange and, if so, the amount of any adverse tax consequences. Accordingly, Mass. Lumber has failed to satisfy the elements of its claim for consequential damages.
III. Allocation of the PaineWebber Settlement
The allocation issue is simply stated: are plaintiffs entitled to allocate the $15,263,542.75 they have received[11] to the punitive rather than to the compensatory damage awards in this case?
The parties’ stipulated facts as to the allocation issue are set forth in the above findings. The remainder of their stipulation is as follows.
On June 11, 2009, the Benistar defendants filed a motion for an order that “Plaintiffs file Satisfaction of Amended Judgment in the Amount of $15,263,542.75, in Favor of all Benistar Defendants to be Applied to the Compensatory Damage Award and File Full Satisfaction of Judgment in Favor of Molly Carpenter.” On July 17, 2009, Merrill filed its “Join-der” in Benistar’s motion (together, Allocation Motion). In the Allocation Motion, Merrill contends that plaintiffs received $15.263 million which, as a matter of law, the Court should allocate to the compensatory damages portion of Benistar’s judgment debt.
Plaintiffs filed their opposition to the Allocation Motion on August 21, 2009, contending that the Court should allocate the settlement sums to the punitive damages portion of Benistar’s judgment debt, because the general rule allows plaintiffs to choose how the funds should be allocated, and plaintiffs have elected to apply them to punitive damages.
On September 30, 2009, Merrill served a motion to compel plaintiffs to produce their 2008 tax returns on the grounds that, if the Court agrees with plaintiffs that the general debtor-creditor rule applies, then the plaintiffs’ tax treatment of the Settlement Proceeds may be relevant to the question of what election they have made. Plaintiffs opposed the motion.
Solely for the Court’s consideration of the Allocation Motion, to the extent that the Court deems plaintiffs’ tax treatment of the Settlement Proceeds relevant, plaintiffs stipulate that the Court may presume that the sums received from the settlement with PaineW-ebber and the Benistar bank account were treated for tax purposes as a return of their lost escrow funds, which are reflected by the compensatory damages portion of the judgment against Benistar. The stipulation is not intended as a waiver of plaintiffs’ arguments in opposition to the Allocation Motion.[12]
In their previous motion papers on the allocation issue, the parties acknowledge that no Massachusetts case has addressed the allocation issue presented here, where the competing debts are not simply be *17 tween different debtors, but comprise both punitive and compensatory damages.
Benistar and Merrill argue that the amount already paid to the plaintiffs must be applied to the compensatory damages portion of the judgment. Benistar also contends that such an allocation fully satisfies the judgment against Molly Carpenter.
Merrill further contends that Benistar, as the primary wrongdoer and independently liable under G.L.c. 93A, should not be relieved of any responsibility to pay punitive damages. Were the Court to conclude otherwise, Merrill argues, it would be forced to pay the plaintiffs’ compensatory damages and then to pursue contribution from the more culpable defendants.
Plaintiffs argue that they may allocate the settlement payment in any way they choose. As support therefor, they rely on cases stating that, when money is owed under two separate sections of a judgment, and the debtor has not selected which debt a payment should be applied toward, the choice then falls to the creditor. See, e.g., City Coal Co. of Springfield, Inc. v. Noonan, 424 Mass. 693, 696 (1997); Warren Bros. Co. v. Sentry Ins., 13 Mass.App.Ct. 431, 433 (1982).
The plaintiffs are correct that a debtor who makes a voluntary payment of indebtedness to his creditor has the power to direct to which portion of his indebtedness his payment is to be applied. Id. Absent a specific allocation, the creditor may make the choice. City Coal Co., 424 Mass. at 696. “This freedom or right of application is based on the concept that because the money which the debtor is utilizing to make the payment is his own, he is free to use it as he sees fit.” United States v. Transamerica Ins. Co., 357 F.Sup. 743, 747 (E.D.Va. 1973), and cases cited.
Here, however, Benistar was ordered to assign its legal claims against PaineWebber “for prosecution” to the plaintiffs. Order dated November 3, 2004 (Botsford, J.) (Ex. 2 to Declaration of Meredith Robinson in Support of Merrill Lynch’s Joinder, paper number 521). The Court’s order further provided: “Any action that the plaintiffs, as assignees, may take with respect to the pending NASD proceedings is a matter for the arbitrators to decide, not this court. Any damages that maybe awarded to Benistar Property against PaineWebber are to be held in escrow by the plaintiffs (through their counsel) pending further order of this Court.” Id.
“A debtor and a creditor cannot affect the application of a payment enforced by judicial proceedings.” Warren Bros., 13 Mass.App.Ct. at 434. Where neither debtor nor creditor has the right to allocate payment, that duty falls upon the Court, which must “follow basic principles of equity.” Transamerica, 357 F.Sup. at 748.
The Court concludes that permitting the plaintiffs to allocate the settlement sums to satisfy punitive damages awarded them would offend both general equitable principles and public policy.
First and most important, as noted above plaintiffs have stipulated “that the Court may presume that the sums received from the settlement with PaineWebber and the Benistar bank account were treated for tax purposes as a return of their lost escrow funds, which are reflected by the compensatory damages portion of the judgment against Benistar.” That stipulation is, in the Court’s view, dispositive.
Moreover, while compensatory damages are joint and several, and may be satisfied by fewer than all tortfeasors, punitive damages adhere more particularly to the offending party. The Court concludes that in this case the goals of “punishment and deterrence” inherent in the award of punitive damages, Gasior v. Massachusetts Gen. Hosp., 446 Mass. 645, 653 (2006), are best served if each party against which a specific punitive damage award has been levied is required to bear that punishment.
IV. Attorneys Fees and Costs
CUTPA provides, at §42-110g:
(d) In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys fees based on the work reasonably performed by an attorney and not on the amount of recoveiy.
“Awarding . . . attorneys fees under CUTPA is discre-tionaiy.” Gargano, 203 Conn. at 622.
In light of the above findings and rulings, the Court concludes that plaintiffs are entitled to attorneys fees and costs in the amounts which plaintiffs and Merrill have stipulated to be reasonable.
To the extent that the parties’ respective requests for findings and rulings are inconsistent with the foregoing, they are denied.
ORDER FOR JUDGMENT
For the reasons stated above, it is hereby ORDERED that judgment shall enter as follows:
A. Consequential Damages
1. As to plaintiff Gail Cahaly’s claim for consequential damages, judgment shall enter against defendant Merrill Lynch in the amount of $545,386.22.
2. As to plaintiff Bellemore Associates, LLC’s claim for consequential damages, judgment shall enter against defendant Merrill Lynch in the amount of $53,499.
3. As to the Iantosca defendants’ (Joseph Iantosca, individually and as trustee of Faxon Heights Apartment Realty Trust and Fern Realty Trust, and Belridge Corporation) claim for consequential damages, judgment shall enter against defendant Merrill Lynch in the amount of $426,408.36.
*18 4. As to the claims of defendants Jeffrey M. Johnston and Massachusetts Lumber Company, Inc. for consequential damages, judgment shall enter in favor of Merrill Lynch.
B.Punitive Damages
As to all plaintiffs’ claims for punitive damages, judgment shall enter in favor of Merrill Lynch; provided, however that in the event Connecticut law is determined to impose vicarious liability on Merrill Lynch for the conduct of Levine as found above, the Court’s award of punitive damages to plaintiffs shall be an amount equal to plaintiffs’ respective actual damages, both compensatory and consequential, in the total amount of $9,669,443.58, allocated to each plaintiff as follows:
1. Gail Cahaly: $1,537,616.22
2. Jeffrey M. Johnston: $541,930
3. Massachusetts Lumber Company, Inc.: $3,237,190
4. Bellemore Associates, LLC: $498,158
5. Iantosca plaintiffs (Joseph Iantosca, individually and as trustee of Faxon Heights Apartment Realty Trust and Fern Realty Trust, and Belridge Corporation): $3,854,549.36
C. Satisfaction of Judgment
The Amended Judgment dated November 18, 2004 is deemed fully satisfied as to defendant Molly Carpenter, and is deemed partially satisfied as to the remaining Benistar defendants as to the compensatory damages awarded therein, in the amount of $15,263,542.75.
D. Attorneys Fees and Costs
An award shall enter against Merrill Lynch and in favor of plaintiffs for attorneys fees in the amount of $8,015,000, plus costs in the amount of $685,000.

 In late 2000, the funds were transferred to similar accounts at UBS PaineWebber, Inc.

 the specific awards were as follows: Cahaly — $992,230; Johnston — $541,930; Mass. Lumber — $3,237,190; Iantosca — $2,913,306.86; Belridge — $514,834.14; Bellemore — $444,659. See Cahaly v. Benistar Prop. Exch. Trust Co., 451 Mass. 343, 345, n.5 (2008) (hereafter, “Cahaly").

 following a bench trial in March 2003, the trial judge found the Benistar defendants, except for Molly Carpenter, liable under G.L.c. 93A. See Cahaly, at 346, n.9. In November 2004, the judge entered an amended final judgment for plaintiffs against all but two of the Benistar defendants in the amount of plaintiffs’ compensatory damages (totaling $8,644,150), plus punitive damages in an equal amount, and prejudgment interest on the compensatory damage award. A judgment of $3,872,800 was entered against Molly Carpenter. That judgment was for compensatory damages only, and ran only in favor of plaintiffs Bellemore, Iantosca, and Belridge.

 The remainder of the parties’ stipulation is set out in the Rulings of Law below.

 See Memorandum and Order on Plaintiffs’ Motion for Sanctions, entered this date.

 The parties have focused their discussion of punitive damages on CUTPA, on the basis that the analysis under New York’s counterpart, the New York Consumer Protection Statute, is substantially similar; the Court will do the same.

Plaintiffs do not ground their punitive damage claims solely on the conduct of Tabbah and Rasmussen, but those individuals are the primary actors in plaintiffs’ account of alleged punishable conduct by Merrill’s management employees.

“Plaintiffs’ Proposed Juiy Instructions No. [13] — NY Consumer Protection Statute” was to the same effect:.".. the plaintiffs must establish that the conduct of Merrill Lynch in knowingly assisting in carrying on risky stock option trading with Benistar property’s client funds—if you find that Merrill Lynch did engage in such activity—had an impact on a range of consumers who did or might do business with Benistar Property and Merrill." The Court so instructed the jury.

I.e., the credit to Benistar of $15,000,000 from the PaineWebber settlement, plus the $113,543.76 plaintiffs received from a Benistar bank account and $150,000 from a settlement with Martin Paley. See Findings, section III.

Here ends the parties’ stipulation.